(No. 34161.— )

BARCO MANUFACTURING COMPANY *et al.*, Appellants, *vs.* WARREN WRIGHT, Treasurer of the State of Illinois, *et al.*, Appellees.

*Opinion filed November 26, 1956—Rehearing denied Jan. 23, 1957.*

LEE C. SHAW, and JOHN HARRINGTON, both of Chicago, and MONTGOMERY S. WINNING, of Springfield, for appellants.

LATHAM CASTLE, Attorney General, of Springfield, (WILLIAM C. WINES and JOHN G. SMITH, of counsel,) for appellees.

Mr. JUSTICE DAVIS delivered the opinion of the court:

This case comes before us on appeal from an order of the circuit court of Sangamon County denying petitioners leave to file a complaint to enjoin the disbursement of public funds by defendants.

Petitioners, an Illinois corporation of Lake County, and three citizens of Illinois doing business as a partnership in Champaign County, are liable to assessment for involuntary contributions to the Illinois Unemployment Compensation Fund, (hereinafter called the Fund,) under the Illinois Unemployment Compensation Act. (Ill. Rev. Stat. 1955, chap. 48, pars. 300-820 incl.) They filed the instant petition pursuant to "An Act in relation to suits to restrain and enjoin the disbursement of public moneys by officers of the state." (Ill. Rev. Stat. 1955, chap. 102, pars. 11-16, incl.) That act provides that such suits by a citizen and taxpayer shall be commenced by a petition for leave to file. If, upon hearing, the court is satisfied that there is reasonable ground for the filing of such complaint, the court may grant the petition. The purpose of this act was to establish a procedure which would serve as a check upon the indiscriminate filing of such suits. (*Hill* v. *County of La Salle,* 326 Ill. 508.) The case comes before us to review the exercise of the trial court's discretion in finding that there is not reasonable ground for the filing of such complaint. In making this determination, facts well pleaded in the petition and complaint must be considered as true. *Daly* v. *County of Madison,* 378 Ill. 358; *Lund* v. *Horner,* 375 Ill. 303; *Greenfield* v. *Russel,* 292 Ill. 392.

By the complaint sought to be filed, petitioners allege that they are employers in this State subject to assessment for involuntary contributions into the Fund; that the rate of tax is determined under a system which takes into consideration the individual employer's unemployment experience, as well as the accumulated experience of all employers covered. The complaint further alleges that a contract was made between the Ford Motor Company and the UAW-CIO which provided for private supplemental payments to persons receiving unemployment compensation; that many other employers under the act had similar contracts; that such contracts provided for the establishment of a private fund by such companies, which would be used to pay benefits to unemployed workers to supplement their regular unemployment compensation; and that one of the conditions of eligibility for benefits under the Ford contract is that the employee "has received a State system unemployment benefit not currently under protest by the company." Petitioners state that such private benefits constitute wages within the meaning of that term as used in the Illinois Unemployment Compensation Act, and that, therefore, the recipients of said benefits are ineligible for State unemployment compensation; that the defendants threaten to make payments to such employees; that the total payments from the State fund would be greater if such unlawful disbursements were made; and that this would adversely affect the State experience factor and ultimately result in a higher tax rate for the petitioners.

Petitioners' theory is that they are entitled, as taxpayers and contributors to the Fund, to enjoin illegal disbursements therefrom, and that the payment of unemployment compensation to one receiving benefits under the aforementioned private agreement is illegal. The defendants contend that their threatened action will not increase the tax burden of petitioners; that petitioners will not be affected adversely thereby; that the relief prayed for would

not protect the alleged interest of the petitioners; and that the complaint sought to be filed is a mere attempt to seek a predetermination of the validity of anticipated claims on a blanket basis by the petitioners without resorting to their primary administrative remedies.

The petitioners assert a basic right to bring this type of action on two grounds. First, that they are taxpayers who are thereby entitled to enjoin the illegal distribution of public funds; and second, that as contributors to the Fund, they will be damaged by a diminution thereof. We turn our attention first to their character as taxpayers seeking to enjoin the misuse of public funds. It has long been the rule in Illinois that citizens and taxpayers have a right to enjoin the misuse of public funds, and that this right is based upon the taxpayers' ownership of such funds and their liability to replenish the public treasury for the deficiency caused by such misappropriation. The misuse of these funds for illegal or unconstitutional purposes is a damage which entitles them to sue. *Krebs* v. *Thompson,* 387 Ill. 471; *Fergus* v. *Russel,* 270 Ill. 304.) This theory invoked by petitioners, and the cases in support thereof, are inapposite here. An examination of the cited cases, which involved taxpayer suits to enjoin disbursement of public funds, reveals that they dealt with disbursement of funds out of the general revenue of the State or its agency; funds which were raised through taxation and were deposited in the general revenue or similar fund for disbursement by appropriation of the General Assembly or corresponding legislative body of an agency of the State. The fund here involved is a special fund, which may most appropriately be called a "trust fund." It consists of contributions of employers under the Unemployment Compensation Act which provides that all such funds "shall be paid or turned over to and held by the State Treasurer, as ex-officio custodian thereof, separate and part from all public monies or funds of this State, and shall be admin-

istered by the Director exclusively for the purposes of this Act." (Ill. Rev. Stat. 1955, chap. 48, par. 660.) Generally, the act further provides that the Treasurer shall deposit said Fund with the United States Treasury to the credit of the account of this State under the unemployment trust fund established and maintained pursuant to the Federal Social Security Act, as amended. These benefit funds there remain until requisitioned for the payment of benefits to unemployed workers.

As we stated in *Price* v. *City of Mattoon*, 364 Ill. 512, at page 514: "A right of a taxpayer to sue rests upon a misappropriation of general public funds and the municipality must have a right in the funds alleged to be misappropriated." It is clear that the fund in question is not a general public fund; nor is it a part of the general State revenue; and the involuntary contributions thereto are not general taxes. It is rather a trust fund composed of contributions made by employers. (*Lindley* v. *Murphy*, 387 Ill. 506; *Zehender & Factor Inc.* v. *Murphy*, 386 Ill. 258.) The distinction between misappropriation of funds out of the general revenue and out of such trust fund is clearly set out in our decisions. The illegal expenditure of general public funds may always be said to involve a special injury to the taxpayer not suffered by the public at large. However, when the expenditure involved is from a trust fund, the petitioner must show a special injury not common to the public generally. (*Price* v. *City of Mattoon*, 364 Ill. 512; *Koehler* v. *Century of Progress*, 354 Ill. 347; *McCormick* v. *Chicago Yacht Club*, 331 Ill. 514; *Hartshorn* v. *Bierbom*, 312 Ill. 275.) Absent such special injury, a private citizen cannot call upon a court of equity to enjoin an injury threatened to purely public rights. *Golden* v. *City of Flora*, 408 Ill. 129 at 132.

Since this is not a suit to enjoin an expenditure of the general revenue, we turn to the right of the petitioners to sue in their capacity as contributors to the Fund. Such

right is clearly dependent upon a special right or special injury different in degree and kind from that suffered by the public at large. While petitioners have alleged the general conclusion that they will be irreparably damaged, if the court can see, under the law, that they would not be irreparably damaged, and if the court can see that the allegations of special injury are unjustified and cannot be true, then, it need not consider such allegations as true. (*Ryan* v. *City of Chicago*, 369 Ill. 59.) It is therefore necessary to analyze the method under the act which is used to determine the assessment made against employers for the Fund. An analysis of the experience rating formula for the determination of rates of assessment under the Unemployment Compensation Act will disclose that the possibility of an increase in the State experience factor by reason of the alleged illegal payments is extremely uncertain and remote.

So that the State may set an employer's future rate of contributions, it maintains an experience rating record for each employer subject to the act. As soon as an employer's former worker is paid benefits amounting to three times his weekly benefit amount, all wages (not in excess of a specified amount) paid to such worker by that employer during the worker's base period are entered on the employer's experience rating record as "benefit wages." The State also enters on each employer's experience rating record the amount of wages upon which he pays contributions. From this experience rating record the State determines what percentage of the employer's payroll was paid to workers who became unemployed and who were paid benefits amounting to at least three times their weekly benefit amount. This percentage is known as the "benefit wage ratio" of the employer.

The second element that enters into the computation of an employer's rate is the "State Experience Factor." This is determined by dividing the total benefits paid to all

unemployed workers, in the same period as is used to measure the benefit wage ratio, by the benefit wages charged to all employers in the State during this period. The employer's rate is then computed by multiplying the individual employer's benefit wage ratio by the State experience factor. This multiplication is done by means of a table in the act (Ill. Rev. Stat. 1955, chap. 48, par. 576,) which lists employers' rates at intervals of one-eighth of one per cent based on their benefit wage ratios.

The general objective of the experience rating formula is to have each employer repay into the Fund the approximate amount of benefits paid to his workers or former workers. In theory, this is done by determining what percentage of his past payroll is represented by the amount of "benefits" paid to his workers which are attributed to him, and applying this rate to his future payroll. However, since "benefit wages" rather than actual benefits are charged to the employer, it is first necessary to translate "benefit wages" into "benefits." The act provides that benefit wages of an individual employer are translated into benefits chargeable to him by the application of the State experience factor. The State experience factor is merely the relationship between all benefits paid in the State during a period specified in the act and all "benefit wages" charged to employers in the State during the same period. Thus, if, for example, $18 in benefits were paid for every $100 in benefit wages charged to all employers in the State, the State experience factor would be 18%. This factor is then used to translate each employer's "benefit wages" into "benefits" chargeable to him. Thus, if the State experience factor is 18%, then for each $100 of benefit wages chargeable to an employer, he is charged with $18 in "benefits." The ratio of these "benefits" so determined to his payroll during the same period then becomes the employer's rate.

Employers who have entered into supplemental benefit

agreements, like other employers, will be charged with "benefit wages" upon the payment of unemployment compensation to their workers. The charges against these employers' accounts are as likely to decrease the State experience factor as they are to increase it. Let us assume that without the payments in question the State experience factor would be 18%; that is, that on the average $18 in benefits have been paid for every $100 in wages that have been charged. If a worker who has earned $3000 from the Ford Motor Company in his base year draws $540 in benefits, his benefits amount to 18% of his base period wages, and the payment of these benefits has neither increased nor decreased the State experience factor. This is so because $18 in benefits have been added to the total of all benefits paid in the State for each $100 added to the total of all employers' benefit wages. If the same worker drew only $300 in benefits, then he was paid only $10 in benefits for each $100 in base period wages with which his employer has been charged. Thus, in this example, the total benefits heretofore paid to all beneficiaries in the State have been increased by only $300, while the total of all benefit wages charged to all employers has been increased by $3000. The effect of such a charge, therefore, would be to increase the amount of benefits proportionately less than the amount of benefit wages, and thus have a tendency to decrease the State experience factor. Petitioners have stated that they are in no position to know the amount of benefits drawn by individual workers under the supplemental plan. It is obvious that they cannot know and cannot prove whether or not these payments will increase or decrease the State experience factor.

Even were we to assume that the benefit payments in question would increase the net amount of benefits payable from the Fund, and that the benefit wage charges would remain static, it is highly uncertain and speculative that the State experience factor would be increased. This is

so because the amount of benefits paid in any fiscal period might be increased by millions of dollars and still not result in an increase in the State experience factor.

It should also be noted that the payment of supplemental benefits do the petitioners no harm, legal or actual. They do not serve to increase, one iota, the involuntary contributions paid by them, or the unemployment compensation benefits paid under the act. Petitioners' only contention is that the payment of supplemental benefits makes illegal the payment of unemployment compensation benefits which would theretofore have been legal and proper. This gives rise to the question of whether a court of equity can grant relief to the plaintiffs which would not in any way prevent their alleged injury. Thus, if, after hearing, the trial court had granted the relief prayed for and had issued injunctions restraining the payment of unemployment compensation benefits to individuals receiving private supplemental benefits, and disqualifying such recipients from eligibility for unemployment compensation, the provisions of the supplemental benefit plan before us would only cut off the supplemental benefits. The Ford contract provides, by article V, section 2(b)(3), that benefits are payable to an individual employee only after he has received or is eligible to receive a State unemployment benefit. It appears clear to us that the plan by its very terms is in truth supplemental. It can operate only if the receipt of its benefits does not preclude the receipt of State unemployment compensation. It necessarily follows that the only result of the relief requested by plaintiffs would be to prevent the operation of the Ford contract in this State, except under its provisions for "substituted benefits."

Petitioners, however, argue that the supplemental benefit plan induces malingering among employees. They thereby attempt to attack the policy of a private contract between employers and employees without bringing either of such parties before the court. We can see no interest, nor has

any been alleged, that plaintiffs might have in that contract. Their interest, if any, is not one which is legally protected. (Cf. *Golden* v. *City of Flora,* 408 Ill. 129.) Likewise, it does not appear that the plaintiffs have suffered, or will suffer any harm from the trial court's denial of their petition for leave to file complaint herein. The most that can be said of the alleged damage is that it amounts to nothing more than the bare possibility of future injury. (*Gange Lumber Co.* v. *Rowley,* 326 U.S. 295, 90 L. ed. 85; *Winchester Repeating Arms Co.* v. *Radcliffe,* 134 Conn. 164, 56A.2d 1.) It is a fundamental principle of equity that to entitle one to permanent injunctive relief he must establish actual and substantial injury and not merely technical, inconsequential, or speculative damage; and that such relief will not be granted to allay unfounded fears or misapprehensions. *Nichols* v. *City of Rock Island,* 3 Ill.2d 531; *Allott* v. *American Strawboard Co.* 237 Ill. 55.

Since the petitioners have not shown that they will be harmed financially by the conduct complained of, or that the relief prayed will protect any legal interest which they may have, we find that the trial court acted within the bounds of its legal discretion in denying the petition to file the complaint.

Because of this conclusion, and the fact that none of the parties to the supplemental benefit agreements are before the court, we think it would be improper for us to comment upon the legal propriety of disbursement of unemployment benefits to persons receiving supplemental benefits, and under this decision we need not determine whether this action will lie without petitioners first exhausting their administrative remedies. The order of the trial court is accordingly affirmed.

*Order affirmed.*