NO. 4-10-0199          Filed 1/26/11

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| DAVID BARBER, | ) | Appeal from |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| THE CITY OF SPRINGFIELD, an Illinois | ) | No. 09MR896 |
| Municipal Corporation, and LEGACY | ) | |
| POINTE DEVELOPMENT COMPANY, an | ) | Honorable |
| Illinois Limited Liability Company, | ) | Patrick W. Kelley, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE POPE delivered the judgment of the court, with opinion.

Justices Turner and Steigmann concurred in the judgment and opinion.

**OPINION**

In March 2010, the trial court dismissed plaintiff David Barber's complaint against defendants, the City of Springfield (City) and Legacy Pointe Development Company (Legacy Pointe), for lack of standing pursuant to defendants' motions under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2008)). Plaintiff appeals, arguing he has standing as a taxpayer of the City. We affirm.

I. BACKGROUND

In December 2009, plaintiff filed this suit for declaratory and injunctive relief, claiming the City illegally enacted public ordinances by which it, *inter alia*, established the South Central Business District (see 65 ILCS 5/11-74.3-2 (West 2008)); adopted a business plan with respect to the district (see 65 ILCS 5/11-74.3-1 (West 2008)); imposed retailers', service, and hotel

operators' occupation taxes on businesses in the district (see 65 ILCS 5/11-74.3-3(12), (13) (West 2008)); and entered into agreements with Legacy Pointe to develop the district (see 65 ILCS 5/11-74.3-3(6) (West 2008)). Specifically, plaintiff alleged the City acted upon fraudulent findings that the area comprising the district was blighted and would not develop naturally in the absence of business districting (see 65 ILCS 5/11-73.3-5(3) (West 2008)).

In his complaint, plaintiff alleged he had standing as a taxpayer of the City. Citing *Malec v. City of Belleville*, 384 Ill. App. 3d 465, 891 N.E.2d 1039 (2008), plaintiff alleged in the complaint, "As a taxpayer, plaintiff has an equitable interest in tax funds[,] and he has standing to bring an action in equity to prevent his equitable interest in public resources from being used for an illegal purpose." Plaintiff further alleged,

> "The [C]ity plans to spend millions of dollars in tax funds in connection with the *** ordinances and the agreements executed pursuant to those ordinances. Accordingly, *** plaintiff has been irreparably harmed[,] and this harm will continue unless and until this [c]ourt grants injunctive relief."

In count I of his complaint, plaintiff characterized the City's findings of blight and unlikelihood of development as "a fraud on the taxpayers of the [C]ity." In count II, he alleged again, "The [C]ity plans to spend millions of dollars in tax funds in

- 2 -

connection with the *** ordinances and *** agreements executed pursuant to those ordinances."

In January 2010, the City filed a combined motion pursuant to section 2-619.1 to dismiss the complaint under sections 2-615 and 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619(a)(9), 2-619.1 (West 2008)), and Legacy Pointe filed separate motions to dismiss under sections 2-615 and 2-619(a)(9). Both defendants asserted plaintiff's lack of standing, *inter alia*, as an affirmative defense to the complaint requiring dismissal under section 2-619(a)(9).

In March 2010, the trial court held a hearing on defendants' motions to dismiss and granted both defendants' section 2-619(a)(9) motions in a docket order. The court agreed with defendants' argument that plaintiff lacked standing as a taxpayer. The court found, specifically,

> "because [p]laintiff does not own property
> within the business district and is not re-
> quired to purchase goods there, he is not
> within the universe of taxpayers who may be
> adversely affected by the 1% supplemental
> sales tax imposed in the business district.
> Additionally, the court finds the 1%
> business[-]district tax is imposed in addi-
> tion to the standard city sales tax[;] conse-
> quently, the business[-]district tax results
> in no dimunition [*sic*] of sales[-]tax revenue

- 3 -

to the [C]ity that would require replenish-

ment by taxpayers."

Because it found plaintiff lacked standing, the court did not

address the remaining arguments presented by defendants in their

motions to dismiss.

This appeal followed.

## II. ANALYSIS

On appeal, plaintiff argues he enjoys standing as a

taxpayer of the City to challenge the City's expenditure of funds

to develop the business district pursuant to the allegedly

fraudulent ordinances in question. Defendants maintain plaintiff

lacks standing because of the nature of the business-district

taxes plaintiff challenges. We agree with defendants and affirm.

### A. Standard of Review

We review the trial court's dismissal pursuant to a

section 2-619(a)(9) motion to dismiss *de novo*. See *Sellers v.*

*Rudert*, 395 Ill. App. 3d 1041, 1045, 918 N.E.2d 586, 590 (2009).

Further, we review the trial court's finding plaintiff lacked

standing *de novo*. See *Hurlbert v. Brewer*, 386 Ill. App. 3d 1096,

1101, 899 N.E.2d 582, 586 (2008).

### B. Taxpayer Standing

The doctrine of standing allows courts to "preserve for

consideration only those disputes which are truly adversarial and

capable of resolution by judicial decision." *Martini v. Netsch*,

272 Ill. App. 3d 693, 695, 650 N.E.2d 668, 669 (1995). Standing

consists of an "injury in fact to a legally recognized interest."

- 4 -

*Martini*, 272 Ill. App. 3d at 695, 650 N.E.2d at 669.  The injury must be (1) "distinct and palpable," (2) "fairly traceable to the defendant's actions," and (3) "substantially likely to be prevented or redressed by the grant of the requested relief." *Martini*, 272 Ill. App. 3d at 695, 650 N.E.2d at 670.  Standing determinations may differ, "depending on the issue involved and the nature of the relief sought."  *Martini*, 272 Ill. App. 3d at 695, 650 N.E.2d at 670.  "Whether the plaintiff has standing to sue is to be determined from the allegations contained in the complaint."  *Martini*, 272 Ill. App. 3d at 695, 650 N.E.2d at 670.

A plaintiff's status as a taxpayer may provide a basis for his or her standing.  The key to taxpayer standing is the plaintiff's liability to replenish public revenues depleted by an allegedly unlawful governmental action.  Such taxpayers have a legally cognizable interest in their tax liability, their increased tax liability is a specific injury, and their injury is redressable by an injunction against the challenged governmental expenditure of tax funds.

Accordingly, "[i]t has long been the rule in Illinois that citizens and taxpayers have a right to enjoin the misuse of public funds, and that this right is based upon the taxpayers' ownership of such funds and their liability to replenish the public treasury for the deficiency caused by such misappropriation."  *Barco Manufacturing Co. v. Wright*, 10 Ill. 2d 157, 160, 139 N.E.2d 227, 229 (1956).  This is because "[t]he illegal expenditure of general public funds may always be said to involve

a special injury to the taxpayer not suffered by the public at large," *i.e.*, nontaxpaying citizens. *Barco Manufacturing Co.*, 10 Ill. 2d at 161, 139 N.E.2d at 230. A plaintiff whose claims rest on his or her standing as a taxpayer must allege such equitable ownership of funds depleted by misappropriation and his or her liability to replenish them in the complaint; otherwise, the complaint is "fatally defective." *Golden v. City of Flora*, 408 Ill. 129, 131, 96 N.E.2d 506, 508 (1951). When general public funds are not directly or contingently at issue, plaintiffs lack standing as taxpayers and must establish another ground for standing. See *Price v. City of Mattoon*, 364 Ill. 512, 515, 4 N.E.2d 850, 852 (1936) ("Aside from the fact that plaintiffs, as taxpayers, have failed to make out a case cognizable in a court of equity, they have also failed to show by their amended complaint any other ground for equitable interference").

The determination of whether general public funds are at issue in a taxpayer action often requires interpretation of the statutes defining the source and usage of the funds the misappropriation of which is alleged. For example, in *Golden*, 408 Ill. at 130, 96 N.E.2d at 507, the plaintiffs sued as taxpayers of the city to enjoin the city from, *inter alia*, performing under a collective-bargaining agreement between itself and a labor union representing employees of a municipally owned and operated utility company. The plaintiffs argued "the bargaining agreement increased the pay of the employees of the municipal utilities involved, thus creating a financial burden and loss to them as taxpayers and citizens of the city." *Golden*, 408 Ill. at

- 6 -

131, 96 N.E.2d at 507. The supreme court examined the statutes governing the municipal utility company and concluded, because the operation of the utility was funded by the utility rates, "the utilities here involved operate independently of the general revenue[,] and the increased burdens and costs of operating them, of which plaintiffs complain as taxpayers, will not result in an increase of [taxpayers'] taxes." *Golden*, 408 Ill. at 132, 96 N.E.2d at 508.

The supreme court engaged in a similar analysis in *Barco Manufacturing Co.* There, the plaintiffs were employers charged with paying unemployment taxes into a trust fund from which unemployment benefits were paid. *Barco Manufacturing Co.*, 10 Ill. 2d at 159, 139 N.E.2d at 229. They challenged disbursements from the trust fund to unemployed persons who received supplemental benefits through private contracts with their former employers. *Barco Manufacturing Co.*, 10 Ill. 2d at 159, 139 N.E.2d at 229. Under applicable state and federal statutes, the court found the funds were not available to the state for general expenses. *Barco Manufacturing Co.*, 10 Ill. 2d at 160-61, 139 N.E.2d at 229-30. Distinguishing general public funds from trust funds, the court concluded the expenditure of the unemployment funds in question did not accord the plaintiffs' taxpayer standing. *Barco Manufacturing Co.*, 10 Ill. 2d at 161, 139 N.E.2d at 230.

1. *Business Districts and Taxpayer Standing*

Our analysis of division 74.3 of article 11 of the Illinois Municipal Code (Code) (65 ILCS 5/11-74.3-1 through 11-

- 7 -

74.3-6 (West 2008)), which defines municipalities' powers and lays out procedural requirements regarding business-district formation, taxation, lending, and spending, informs our conclusion that plaintiff lacks standing to challenge the ordinances at issue in this case.

The Code lays out broad powers that municipalities enjoy in instituting and implementing business districts. It empowers the corporate authorities of each municipality, *inter alia*, to designate an area of the municipality as a business district, to adopt development and redevelopment proposals for such business district, to borrow funds as necessary for business-district development or redevelopment and issue any obligations and bonds in connection with such borrowing, to enter into contracts with private and public bodies, to expend public funds as necessary in connection with business-district development or redevelopment planning and administration, and to issue obligations secured by the Business District Tax Allocation Fund (Business-District Fund). 65 ILCS 5/11-74.3-2, 11-74.3-3(1), (5), (6), (9), (14) (West 2008). The Code does not impose any special procedural requirements on a municipality that exercises any of these powers.

The Code also allows municipalities to impose special occupation taxes within business districts if the municipalities comply with certain procedural requirements. Specifically, it empowers cities to impose retailers', service, and hotel operators' occupation taxes in the business district to pay for project costs. 65 ILCS 5/11-74.3-3(12), (13) (West 2008). If

- 8 -

and only if it intends to impose such occupation taxes within a business district, a municipality must first, *inter alia*, make two formal findings.  First, the municipality must find

"the business district is a blighted area that, by reason of the predominance of defective or inadequate street layout, unsanitary or unsafe conditions, deterioration of site improvements, improper subdivision or obsolete platting, or the existence of conditions which endanger life or property by fire or other causes, or any combination of those factors, retards the provision of housing accommodations or constitutes an economic or social liability or a menace to the public health, safety, morals, or welfare in its present condition and use."  65 ILCS 5/11-74.3-5(3) (West 2008).

Second, it must find

"the business district on the whole has not been subject to growth and development through investment by private enterprises or would not reasonably be anticipated to be developed or redeveloped without the adoption of the business[-]district development or redevelopment plan."  65 ILCS 5/11-74.3-5(3) (West 2008).

Once they have made these findings and complied with

- 9 -

the other procedures enumerated in section 11-74.3-5, the Code empowers municipalities to tax retailers, service providers, and hotel operators doing business within the business district at a rate not to exceed 1% of gross receipts. 65 ILCS 5/11-74.3-6(b), (c), (d) (West 2008). In turn, the Code permits retailers to reimburse themselves for their tax liability by collecting the amount of the tax from consumers who purchase goods and services in the district. 65 ILCS 5/11-74.3-6(b), (c), (d) (West 2008). It requires the municipality to deposit the proceeds of these taxes "into a special fund held by the corporate authorities of the municipality called the Business[-]District *** Fund for the purpose of paying business[-]district project costs and obligations incurred in the payment of those costs." 65 ILCS 5/11-74.3-6(a) (West 2008). Further, any ordinance authorizing the issuance of obligations to fund business-district project costs "shall pledge all of the amounts in and to be deposited in the Business[-]District *** Fund to the payment of business[-]district project costs and obligations." 65 ILCS 5/11-74.3-6(e) (West 2008).

As an initial matter, we address plaintiff's standing to challenge the entirety of the ordinances of which he complains. In these ordinances, the City, *inter alia*, established the South Central Business District (see 65 ILCS 5/11-74.3-2 (West 2008)); adopted a business plan with respect to the district (see 65 ILCS 5/11-74.3-1 (West 2008)); imposed retailers', service, and hotel operators' occupation taxes on businesses in the district (see 65 ILCS 5/11-74.3-3(12), (13) (West 2008)); and

- 10 -

entered into agreements with Legacy Pointe to develop the district (see 65 ILCS 5/11-74.3-3(6) (West 2008)). The crux of plaintiff's complaint is that the City's findings regarding the economic state and developmental prospects of the area comprising the business district (see 65 ILCS 5/11-74.3-5(3) (West 2008)) were fraudulent. The relief he requests (invalidation of all of the ordinances) is based solely on these alleged defects. Even if proved, however, these alleged defects would not entitle plaintiff to the entirety of the relief he seeks because the prerequisites plaintiff claims the City failed to meet apply only to the occupation taxes the City implemented in the ordinances. Thus, we must affirm the trial court's dismissal of plaintiff's complaint with respect to his challenge of any of the City's actions apart from its imposition of occupation taxes within the business district. Accordingly, we limit the following analysis to whether plaintiff enjoyed taxpayer standing to challenge the imposition and expenditure of such business-district taxes.

We conclude from their nature the business-district occupation taxes imposed by the City do not deplete its general revenue as they are separate from and supplemental to citywide occupation taxes. Although segregation alone is not enough to block taxpayer standing (*Malec*, 384 Ill. App. 3d 465, 891 N.E.2d 1039), it is significant that proceeds of the business-district tax are segregated upon collection and pledged to fund costs related to the business district.

More significantly, however, the business-district taxes are supplemental to the City's general occupation taxes and

- 11 -

do not detract from the City's general revenue fund. The City continues to collect any non-business-district-specific occupation taxes on businesses operating in the business district, and these taxes go to the City's general revenue. That is, the City's general revenue fund receives the same amount from the sale of a retail item or a service, or from the lease or rental of a hotel room, whether the transaction occurs within the business district or outside it. Thus, the business-district taxation at issue here does not deplete the City's general revenue, and plaintiff, as a taxpayer of the City, cannot be held liable to replenish the City's general corporate fund.

Plaintiff correctly notes the City must transfer to its general corporate fund any surplus funds remaining in the Business-District Fund after all business-district expenses and obligations are paid. See 65 ILCS 5/11-74.3-6(f) (West 2008). Plaintiff asserts the City thus forgoes general revenue by spending money out of the Business-District Fund.

This is a completely circular argument. Plaintiff claims if there were no expenditures from the Business-District Fund, the funds would be available as general revenue. This overlooks the funds would not even exist without the imposition of the special tax and the imposition of the special tax is only allowed where a municipality has determined it beneficial to form a business district. The funds generated are then available to cover development and redevelopment costs in the business district. It would be unlawful to impose the special tax if there was no redevelopment or development plan.

- 12 -

Nevertheless, plaintiff argues the expenditure of money in the Business-District Fund provides him with standing as a taxpayer to challenge the business-district taxes. Turning to the complaint, we find plaintiff did not allege the City expended or planned to expend funds from the Business-District Fund. Rather, plaintiff complained of the City's plans to spend "tax funds" in general. Plaintiff cannot now, in his appellate brief, refine the allegations in his complaint to argue he has standing. See *Martini*, 272 Ill. App. 3d at 695, 650 N.E.2d at 670. Further, as explained above, the Code empowers municipalities to spend public funds without making the findings required under section 11-74.3-5(3). 65 ILCS 5/11-74.3-3(9) (West 2008). Consequently, as he limited his complaint to his attack on the City's section 11-74.3-5(3) findings, plaintiff's challenge properly extends only to expenditures of funds specifically from the Business-District Fund. By failing to specifically allege the City planned to expend money from the Business-District Fund, plaintiff failed to plead facts supporting his standing as a taxpayer to invalidate the business-district taxes.

Moreover, even if we were to find plaintiff alleged expenditures from the Business-District Fund with sufficient specificity, such expenditures would not endow plaintiff with standing as a taxpayer to challenge the business-district taxes. Any deposit into the City's general corporate fund of a residue from the Business-District Fund would be a windfall to the City resulting from the establishment of the business-district taxation of which plaintiff complains. That is, business-district

- 13 -

taxation may improve the City's general finances by augmenting them with any residue but may never deplete them.  Thus, plaintiff cannot maintain his challenge in this case on the grounds that business-district taxation will injure him as a taxpayer of the City.

### 2. *Tax Increment Allocation Redevelopment Act and Malec v. City of Belleville*

Plaintiff contends our conclusion regarding a taxpayer's standing to challenge a city's business-district taxation is at odds with that of the Fifth District Appellate Court in *Malec*, 384 Ill. App. 3d 465, 891 N.E.2d 1039.  To the contrary, we find *Malec* reconcilable with our decision in this case although we also reject two statements in *Malec* that, on their face, seem applicable to this case.  Specifically, *Malec* is distinguishable in that, unlike this case, it involved a taxpayer's challenge to a municipality's implementation of tax-increment-allocation financing in conjunction with business-district taxation.  Further, we disagree with the *Malec* court's unqualified statements (1) whether a plaintiff owns property or operates a business within a business district is irrelevant to determining whether a plaintiff has standing and (2) all property- and sales-tax revenue is part of a municipality's general revenue fund.

*Malec* dealt with a plaintiff's challenge to, *inter alia*, a tax-increment-allocation-financing district created pursuant to the Tax Increment Allocation Redevelopment Act (Act) (65 ILCS 5/11-74.4-1 through 11-74.4-11 (West 2008)).  Tax-

increment-allocation financing allows a municipality to fund present development of a designated area by pledging a portion of that area's future property-tax returns to development-project costs. Pursuant to the Act, after a city creates a tax-increment-allocation-financing district, all increases in the property-tax revenue from properties within the district are placed in a special fund to pay or repay development expenses. 65 ILCS 5/11-74.4-3(q) (West 2008). A municipality may implement tax-increment-allocation financing only in a district it has found to be a blighted area, an industrial-park conservation area, or a conservation area. 65 ILCS 5/11-74.4-3(p) (West 2008); see also 65 ILCS 5/11-74.4-3(a) (West 2008) (setting forth the criteria for finding an area is blighted).

In *Malec*, 384 Ill. App. 3d at 467-68, 891 N.E.2d at 1040-41, the plaintiff sought declaratory relief invalidating a set of ordinances designed to promote development of a shopping center and a residential neighborhood and an injunction prohibiting the city from enforcing the ordinances. In the ordinances, the city, *inter alia*, (1) established a tax-increment-allocation-financing district and a business district covering the land being developed and (2) imposed business-district taxes and tax-increment-allocation financing and pledged the resulting revenues to development costs. *Malec*, 384 Ill. App. 3d at 467, 891 N.E.2d at 1040-41. The plaintiff challenged these ordinances, arguing, *inter alia*, the city erroneously found the area comprising the districts was blighted and was not reasonably likely to develop on its own. *Malec*, 384 Ill. App. 3d at 467-68, 891 N.E.2d 1041;

- 15 -

see also 65 ILCS 5/11-74.3-5(3), 11-74.4-3(p) (West 2008).

The plaintiff alleged he had standing as a taxpayer. *Malec*, 384 Ill. App. 3d at 467, 891 N.E.2d at 1040. Finding the plaintiff lacked standing, the circuit court dismissed pursuant to the defendants' section 2-615(e) motion (735 ILCS 5/2-615(e) (West 2006)). *Malec*, 384 Ill. App. 3d at 468, 891 N.E.2d at 1041. The Fifth District Appellate Court held the plaintiff had standing as a taxpayer to challenge (1) the city's establishment of the tax-increment-allocation-financing and business districts and (2) its imposition of taxes and expenditure of funds in relation thereto. *Malec*, 384 Ill. App. 3d at 471, 891 N.E.2d at 1044. In concluding the plaintiff enjoyed taxpayer standing, the court rejected three specific contentions by the defendants. First, the court rejected the defendants' argument the plaintiff lacked standing because he did not own property or operate a business within the area comprising the districts. *Malec*, 384 Ill. App. 3d at 469, 891 N.E.2d at 1042. The court found that fact irrelevant to the plaintiff's standing as a taxpayer of the city. *Malec*, 384 Ill. App. 3d at 469, 891 N.E.2d at 1042.

Second, the Fifth District rejected the defendants' argument that, "because the sources of revenue that the [c]ity is expending are not general revenue sources, the plaintiff lacks standing [as a taxpayer] to challenge their expenditure." *Malec*, 384 Ill. App. 3d at 469, 891 N.E.2d at 1042. The defendants' argument relied on *Price*, *Golden*, and *Barco Manufacturing Co.*. *Malec*, 384 Ill. App. 3d at 469-70, 891 N.E.2d at 1042-43. The court distinguished these cases on the grounds that they dealt

- 16 -

with a taxpayer's standing to challenge "the expenditure of non[]tax revenue." *Malec*, 384 Ill. App. 3d at 470, 891 N.E.2d at 1043. It concluded "property and sales taxes are parts of the general revenue of the [c]ity whether or not they are earmarked for a specific purpose or placed into a special account." *Malec*, 384 Ill. App. 3d at 470-71, 891 N.E.2d at 1043. It expressed concern that "[t]o hold otherwise would be to extend the holding in *Barco[ Manufacturing Co.]* so that tax revenue could be insulated from a taxpayer action by the simple act of segregation." *Malec*, 384 Ill. App. 3d at 471, 891 N.E.2d at 1043. The court implicitly reached the further conclusion that the planned expenditure of funds from the special accounts created by the challenged ordinances would deplete the city's general revenue fund, according the plaintiff taxpayer standing.

Third, the *Malec* court rejected the defendants' argument the plaintiff lacked standing as a taxpayer "because the property[-] and sales[-]tax funds at issue are only those that will be generated by the development project itself." *Malec*, 384 Ill. App. 3d at 471, 891 N.E.2d at 1043. The court found this argument begged the question raised by the plaintiff's complaint. *Malec*, 384 Ill. App. 3d at 471, 891 N.E.2d at 1044. If the area comprising the challenged districts would develop naturally without the actions taken by the city as the plaintiff alleged, the court reasoned, "then all the property[-] and general sales[-] tax revenue from that area would be available as general revenue of the [c]ity rather than to reimburse the [d]evelopers." *Malec*, 384 Ill. App. 3d at 471, 891 N.E.2d at 1044. The court further

- 17 -

noted, in such circumstances, "there would be no need to impose" an additional business-district sales occupation tax, "which may itself deter patrons from shopping or receiving services in that area." *Malec*, 384 Ill. App. 3d at 471, 891 N.E.2d at 1044.

*Malec* is distinguishable from the case at bar because the coupling of a business district with a tax-increment-allocation-financing district covering the same area has unique implications on a plaintiff's standing as a taxpayer. Specifically, a municipality's employment of tax-increment-allocation financing can be said to deplete its general revenue fund if, as the plaintiff in *Malec* alleged, the area comprising the district is not blighted and would develop naturally without the municipality's interference. That is, if the area developed without tax-increment-allocation financing, economic development would likely have the effect of raising property values and, in turn, increasing the municipality's property-tax revenue within the area. In this scenario, these increases in the area's property-tax revenue would become part of the city's general revenue fund. In contrast, if the area developed as a tax-increment-allocation-financing district, these increases in property-tax revenue would go to developers rather than the city's general revenue fund. Thus, the implementation of tax-increment-allocation financing can be said to deplete the city's general revenue fund if the area comprising the district would have developed absent tax-increment-allocation financing. In turn, this depletion of general revenue could give rise to taxpayer standing as the court in *Malec* held. This appears to have been the *Malec* court's concern with the defen-

- 18 -

dants' question-begging argument that only revenues created by the challenged ordinances were at issue in that case.

In contrast, expenditures of revenue from business-district taxes never deplete the general revenue because the business-district taxes are supplemental to general occupation taxes. Business-district occupation taxes are collected in addition to normal occupation taxes. As explained above, this means a municipality's general revenue fund would receive the same amount in taxes from a transaction whether it occurred within a business district or outside it. As a corollary, whether an area develops pursuant to a business-district plan subject to business-district taxation or as a result of natural economic forces, the city's general revenue fund receives the same amount in taxes from the area's commerce. Thus, business-district taxation alone is not amenable to a taxpayer action although tax-increment-allocation financing may be. Because it considered whether a plaintiff had standing as a taxpayer to challenge both tax-increment-allocation financing and business-district taxation, *Malec* is distinguishable from the present case, which involves only plaintiff's challenge to business-district taxation.

Further, we find two aspects of the *Malec* court's analysis that would otherwise apply to this case unpersuasive. First, we would qualify that court's conclusion that a plaintiff's interest in property or trade within a designated business district is irrelevant to that plaintiff's standing to challenge business-district taxes. See *Malec*, 384 Ill. App. 3d at 469, 891 N.E.2d at 1042. Because the inquiry in a taxpayer-standing case

- 19 -

is whether the challenged municipal action depletes the municipality's general revenue fund, thereby obliging the plaintiff as a taxpayer to replenish it, a taxpayer's ownership of property or operation of a business within a business district would not be relevant to whether that taxpayer enjoyed standing to challenge the establishment of the business district or the imposition of related taxes.  However, the taxpayer's interest in the district as a property holder or business operator may be relevant to determining whether he or she enjoyed standing under the usual criteria.

Second, we disagree with the *Malec* court's finding "that property and sales taxes are parts of the general revenue of the [c]ity whether or not they are earmarked for a specific purpose or placed into a special account." *Malec*, 384 Ill. App. 3d at 470-71, 891 N.E.2d at 1043.  In reaching this conclusion, the court distinguished *Price*, *Golden*, and *Barco Manufacturing Co.* on the basis that those cases dealt with "the expenditure of non[]tax revenue" whereas *Malec* dealt with the expenditure of tax revenue. *Malec*, 384 Ill. App. 3d at 470, 891 N.E.2d at 1043.  To justify its conclusion, the court expressed concern with extending "the holding in *Barco[ Manufacturing Co.]* so that tax revenue could be insulated from a taxpayer action by the simple act of segregation." *Malec*, 384 Ill. App. 3d at 471, 891 N.E.2d at 1043.

While technically correct, the Fifth District's distinction between expenditures of tax and nontax revenue cannot control the determination of whether a plaintiff enjoys taxpayer standing to challenge the expenditures. *Barco Manufacturing Co.*, 10 Ill.

- 20 -

2d at 160, 139 N.E.2d at 229, is relevant to taxpayer-standing cases for the proposition that "taxpayers have a right to enjoin the misuse of public funds, and that this right is based upon the taxpayers' ownership of such funds and their liability to replenish the public treasury for the deficiency caused by such misappropriation." Whether challenged funds are from tax or nontax revenue is irrelevant to the determination whether their expenditure depletes the general revenue and obliges taxpayers to replenish it. Where, after careful consideration of the relevant facts and the operation of law, it finds expenditures from a "special account" do not deplete the general revenue, the holding in *Barco Manufacturing Co.* is not improperly extended if a court holds a plaintiff lacks standing as a taxpayer. In fact, the holding in *Barco Manufacturing Co.* is unnecessarily limited if a court employs a shorthand that is neither coextensive with nor logically equivalent to the relevant inquiry into the impact of expenditures on general revenue and citizens' tax liability. A limited reading would potentially result in an overbroad allowance of taxpayer suits where the challenged municipal action does not actually injure taxpayers.

For these reasons, plaintiff's reliance on *Malec* is unpersuasive and has no effect on our holding that he lacks taxpayer standing to challenge the City's business-district taxation and expenditure of the resulting revenue.

## C. Special Injury

Since he lacks standing as a taxpayer, plaintiff must plead circumstances under which he suffers a special injury not

common to the public at large. However, plaintiff's standing, as pled in his complaint, relied entirely on his equitable interest in municipal tax funds and his corresponding equitable interest in preventing public resources from being used for an illegal purpose. Plaintiff did not allege he suffered a special injury. Moreover, plaintiff did not petition the trial court for leave to amend his complaint when confronted with defendants' motions to dismiss for lack of standing.

In summary, plaintiff does not own property in the Business District, nor is he required to collect any Business-District Tax. No general revenue funds have been or will be provided to the district nor will general revenue funds be diminished or depleted because of the creation of the Business District. Plaintiff will have no obligation to replenish the City's general revenue funds and by choosing to shop elsewhere in the City, he can avoid paying the special tax. Accordingly, we find plaintiff lacked standing as a matter of law, and the court did not err in dismissing plaintiff's complaint.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.