(No. 27961.—

ARTHUR H. KREBS, Appellee, *vs.* FRANK G. THOMPSON, Director of Registration and Education, *et al.,* Appellants.

*Opinion filed September 19, 1944.*

472

George F. Barrett, Attorney General, George E. Drach, and Brown, Hay & Stephens, all of Springfield, (William C. Wines, of Chicago, and Paul W. Gordon, of Springfield, of counsel,) for appellants.

Giffin, Winning, Lindner, Newkirk & Jones, (Montgomery S. Winning, of counsel,) all of Springfield, for appellee.

Mr. Justice Smith delivered the opinion of the court:

This is a direct appeal from a decree of the circuit court of Sangamon county. The suit was brought by appellee as a taxpayer, under Illinois Revised Statutes 1943, chap. 102, par. 11. Its purpose was to enjoin the Director of Registration and Education, the Director of Finance, the Auditor of Public Accounts and the State Treasurer from expending any funds of the State for the administration of an act entitled, "An Act to regulate the practice of professional engineering." (Ill. Rev. Stat. 1943, chap. 48½.) By the complaint the validity of the act was challenged on several grounds. The trial court overruled a motion of appellants to dismiss the suit. Appellants stood by this motion. The court entered a decree granting a permanent injunction, as prayed. The appeal has been perfected to this court by the above-named State officials and an intervening appellant.

It will be necessary to first dispose of appellants' contention that appellee, as a taxpayer, cannot maintain the suit. Appellee bases his right to prosecute the suit on the sole ground of his status as a taxpayer. He does not claim that he will be subject to the provisions of the act, or affected by its provisions, except as a taxpayer.

To appellants' motion to dismiss, certain affidavits were attached. Those affidavits tended to show that, in the opinion of the appellants, the act, from a financial standpoint, will be self-sustaining. That is, that the fees paid in by registrants under the act will exceed the cost of administering the act. In one of these affidavits, made by the Superintendent of Registration in the Department of Registration and Education, it was estimated that the number of registrants under the act would be approximately five thousand; that the cost of administering the act would not exceed $11,000. Presumably, this estimate refers to the annual cost. No counter affidavits were filed. Hence the affidavits, in so far as material, must be accepted as true. By section 27 of the act each applicant for registration is required to pay a fee of $20.

It has long been the settled rule in Illinois that the expenditure of public funds by an officer of the State, for the purpose of administering an unconstitutional act, constitutes a misapplication of such funds. It is equally well settled that a taxpayer may maintain an action to enjoin the expenditure of public funds for such purpose. *Reid* v. *Smith,* 375 Ill. 147; *Fergus* v. *Russel,* 270 Ill. 304; *Burke* v. *Snively,* 208 Ill. 328.

Appellants do not challenge this rule. They deny its application to this case. The basis on which this rule is founded is that the taxpayers are the equitable owners of State funds; that such taxpayers are injured by the misapplication of such funds; that an expenditure of public funds in pursuance of an unconstitutional statute is a misapplication of the funds, which may be restrained at the suit

of a taxpayer. *Fergus* v. *Russel,* 270 Ill. 304; *Jones* v. *O'Connell,* 266 Ill. 443; *Dudick* v. *Baumann,* 349 Ill. 46.

The challenge of appellants to the right of appellee to maintain this suit as a taxpayer is based upon a novel and ingenious argument. The argument is that the fees paid by applicants for registration under the act will exceed the cost of administering the act and will result in a net profit to the State. From this premise it is argued that a taxpayer cannot be injured because he has no interest in the fees paid under the act; that such fees are not tax money and hence the taxpayer has no interest in the funds. The argument presupposes that in the administration of the act the fees paid by the applicants for registration do not belong to the State until the administration expenses have been deducted and that the ownership of the State attaches only to the net balance, after the payment of operating costs. We do not think this argument is sound. The source from which the funds expended in the administration of the act are derived is not material. All of the funds, regardless of their source, belong to the State. Section 27 of the act (Ill. Rev. Stat. 1943, chap. 48½, par. 27,) fixes the fees to be paid by applicants for registration. These fees belong to the State. The administration of the act is committed to the Department of Registration and Education. By section 2 of an act in relation to the payment of public money of the State into the State Treasury (Ill. Rev. Stat. 1943, chap. 127, par. 171,) every department or agency of the State is required to pay to the State Treasurer the gross amount of all money received, not later than the day following its receipt. All moneys so paid into the State Treasury, unless the statute requires such money to be paid into a special fund, or such funds are paid under protest in accordance with section 2a of that act (Ill. Rev. Stat. 1943, chap. 127, par. 172,) immediately become a part of the general revenue funds of the State. In view of this statute it would be the duty

of the Director of the Department of Registration and Education to pay into the State Treasury all funds received from applicants for registration. Under this statute, such funds constitute a part of the general revenue funds of the State. *People ex rel. Barrett* v. *Bradford,* 372 Ill. 63; *Chicago Board of Trade* v. *Cowen,* 252 Ill. 554; *Whittemore* v. *People,* 227 Ill. 453.

The departments of the State Government are not operated on a net profit basis. All the funds received by them must be covered into the State Treasury. The cost of administering the act will not be paid, in any event, out of the revenues derived therefrom. Such costs can only be paid out of the general funds in the State Treasury, in accordance with appropriations made for that purpose. (Const. art. IV, sec. 17.) All funds expended for the administration of the act belong to the State and constitute a part of the general revenues of the State.

The argument that a taxpayer has no interest in the funds for the reason that the revenues produced by the act will exceed the cost of administering its provisions must necessarily fall of its own weight. The showing of appellants by the affidavits attached to their motion to dismiss is that there will be an estimated administration expense of $11,000. This can be paid only out of the general funds of the State. The expenditure of this or any other amount from the general funds of the State for the purpose of administering an unconstitutional statute is such an injury to every taxpayer that he may bring a suit to enjoin such unlawful expenditure and misapplication of the funds of the State. The fact that an equal or greater amount than the amount expended for the administration of the act will be ultimately produced from fees paid under the act, and paid into the State Treasury, has nothing whatever to do with the right of a taxpayer to enjoin the misapplication of public funds for the administration of the act, if it is not a valid statute. Under the settled rule in

this State, every taxpayer is injured by the misapplication of public funds, whether the amount be great or small. Such injury is not prevented by the fact that the State may thereafter receive fees under an unconstitutional statute in excess of the cost of its administration.

Under the averments of the complaint, which was sworn to, and which averments were admitted by the motion to dismiss, appellee clearly had the right to maintain the action to prevent what was alleged would constitute a misapplication of State funds.

The cases relied upon by appellants, such as *Daly* v. *County of Madison,* 378 Ill. 357, and *Price* v. *City of Mattoon,* 364 Ill. 512, involved no expenditure of public funds. Those cases are wholly inapplicable to the question here involved.

Appellee's attack on the validity of the act is based chiefly upon his contention that the act is so vague and indefinite in its terms that it cannot be determined what activities are included within the act and what activities are excepted from its provisions. Section 1 provides that, "any person practicing or offering to practice professional engineering is required to submit evidence that he is qualified so to practice and to be registered as hereinafter provided." (Ill. Rev. Stat. 1943, chap. 48½, par. 1.) That section further provides that "it is unlawful for any person not so registered, to practice or offer to practice professional engineering in this State."

Section 2 is a glossary. In that section, "professional engineering" is defined as follows: " 'Professional engineering' means any professional service such as consultation, investigation, evaluation, planning, design, or supervision of construction, in connection with any public or private utilities, structures, buildings, machines, equipment, processes, works, or projects, wherein the public welfare or the safeguarding of life, health or property is concerned

or involved, when such professional service requires the application of engineering principles and data."

Before discussing the language of the act, it seems that a recurrence to a few fundamental principles will not be inappropriate. An act, to be valid, must not be vague, indefinite and uncertain. It must be complete when it leaves the legislature and be sufficiently explicit to advise everyone what his rights are under the act and how he will be affected by its operation. (*Chicagoland Agencies, Inc.,* v. *Palmer,* 364 Ill. 13.) Statutes which are so incomplete, vague, indefinite and uncertain that men of ordinary intelligence must necessarily guess at their meaning and differ as to their application, have uniformly been declared unconstitutional as denying due process. (*Triner Corp.* v. *McNeil,* 363 Ill. 559; *Parks* v. *Libby-Owens-Ford Glass Co.* 360 Ill. 130; *Vallat* v. *Radium Dial Co.* 360 Ill. 407.) It must be regarded as long settled in this State that an act, to be valid, must be complete when it leaves the legislature. If it leaves to a ministerial officer the definition of the thing to which it shall apply, such definition not being commonly known, it is invalid as an unwarranted and void delegation of legislative power to an administrative officer. *People* v. *Yonker,* 351 Ill. 139; *Mayhew* v. *Nelson,* 346 Ill. 381; *Welton* v. *Hamilton,* 344 Ill. 82; *City of Chicago* v. *Matthies,* 320 Ill. 352; *People ex rel. Gamber* v. *Sholem,* 294 Ill. 204; *Kenyon* v. *Moore,* 287 Ill. 233; *People* v. *Vickroy,* 266 Ill. 384; *Sheldon* v. *Hoyne,* 261 Ill. 222; *Noel* v. *People,* 187 Ill. 587.

It will be noted that the definition contained in section 2 gives little insight into what activities are included in the act. Briefly stated, the term "professional engineering" is there defined to mean any professional service wherein the public welfare or the safeguarding of life, health or property is concerned or involved when such professional service requires the application of engineering prin-

ciples and data. When an act defines the terms therein used, those terms must be construed according to the definitions contained in the act. *Smith* v. *Murphy,* 384 Ill. 34; *Rozran* v. *Durkin,* 381 Ill. 97.

Here we have a definition which is all-inclusive. It includes generally all professional service which requires the application of engineering principles and data. The words "engineering principles and data" are not defined in the act. They have no fixed and definite meaning. Engineering service and the application of engineering principles and data extend to many different vocations and employment.

It is said in the Encyclopedia Britannica that in its early use the word "engineering" referred specially to the operations of those who constructed engines of war in executing works to serve military purposes. Such military engineers were for many years the only ones to whom the title applied. But, about the middle of the eighteenth century, there arose a new class of engineers who concerned themselves with works which, though they might be in some cases, as in the making of roads, of the same character as those undertaken by military engineers, were neither exclusively military in purpose nor executed by soldiers. These men, by way of distinction, came to be known as civil engineers. It is also there said that no better definition of their aims and functions can be given than that which is contained in the charter issued in London in 1828 to the Institution of Civil Engineers. In that charter, civil engineering is defined as the "art of directing the great sources of power in nature for the use and convenience of man, as the means of production and of traffic in States, both for external and internal trade, as applied in the construction of roads, bridges, aqueducts, canals, river navigation and docks for internal intercourse and exchange and in the construction of forts, harbors, moles, breakwaters and lighthouses, and in the art of navigation by artificial power for the purpose of commerce, and in the construction

and adaptation of machinery and in the drainage of cities and towns."

An examination of Webster's New International Dictionary, Second Edition, shows that the terms "engineer" and "engineering" are used in connection with, and applied to, the activities of numberless professions and vocations, as well as to various activities in countless undefined operations. The use and meaning of those words in modern commerce and industry are practically unlimited. The activities which they include and to which they may aptly refer cannot be definitely classified or limited within any general definition.

The definition of professional engineering in section 2 is no definition at all. It is but an attempt to delegate to the Department of Registration and Education the power to determine whether a person who renders any service involving the application of engineering principles and data shall be required to secure a license under the act. This is manifest by the language used in other sections of the act.

Section 3 provides for an examining committee to be appointed by the Director of the Department. Section 4 provides the qualifications of committee members. Other than the requirement that they be citizens of the United States and residents of this State, the only requirements are that they have been engaged in the practice of engineering for at least twelve years and have been in charge of engineering work for at least five years.

Section 7 provides the qualifications of applicants for registration under the act. Subsection (b) of section 7 provides that an applicant shall be entitled to receive a certificate of registration if he successfully passes a written, or written and oral, examination, designed to show knowledge and skill approximating that attained through graduation from an approved four-year engineering curriculum and has had eight years or more of experience in engineering work of a *"character satisfactory to the Committee"*

*and indicating the applicant is competent to practice professional engineering.*

Section 9 provides that the scope of the examination and the procedure in connection therewith shall be prescribed by the committee with special reference to the applicant's ability to design and supervise professional engineering work so as to insure the safety of life, health and property. *In the discretion of the committee,* an applicant may be permitted to select from groups of questions pertinent to several branches of engineering, the group which, in the opinion of the applicant, most nearly covers his professional engineering experience.

Section 10 provides that the successful applicant shall be given a certificate as a registered "professional engineer" of Illinois. This certificate will authorize him to engage in any activities or work included within any branch of the term "professional engineer," as defined in the act, regardless of whether he has any qualifications or has had any experience in the particular branch of engineering in which he may engage. If the answers of the applicant to the questions selected by him satisfy the committee that he is competent to practice any branch of engineering, for instance that branch of engineering relating to the construction of highways, he is licensed not only in that branch but as a mining engineer, an electrical engineer, a chemical engineer, an hydraulic engineer, an aeronautics engineer, a petroleum engineer, an automotive engineer, and all of the hundreds of other various kinds of engineers known to the ever expanding and undefined vocabulary of modern science and industry.

The only restriction on the Department in issuing the license is that the applicant, *in the opinion of the committee, has satisfactorily met all the requirements of the act.* But nowhere in the act are these requirements of the act defined. Such requirements are left to the opinion and discretion of the committee. There are no standards or re-

quirements in the act to guide or direct the committee in the formation of its opinion as to what the requirements of the act are. There is no more flexible word in our language than the word engineer. It is a matter of common knowledge that many unlicensed persons have been operating in Illinois for years under the pseudonym of "engineers," as a refuge from the penalties of the law. The term includes everything, but defines nothing.

The act itself provides no qualifications or training, nor does it prescribe the character of the questions to be propounded to the applicant, or the subjects to which such questions shall relate. This is left entirely to the "opinion of the committee." The committee is given no guide by the act in the selection of the questions or in the determinations of the qualifications of the applicant. The result is that the legislature has simply delegated to the Department of Registration and Education the power to require all those to register who, *in the opinion of the committee,* are engaged in rendering any professional service wherein the public welfare or safeguarding of life, health or property is concerned, provided only, that such service requires the application of engineering principles and data. This is clearly a delegation of legislative power to ministerial officers in violation of the constitution. In the case of *People* v. *Schaeffer,* 310 Ill. 574, this court declared invalid a section of the Medical Practice Act relating to the licensing of osteopaths, which provided that the examination "shall be of a character sufficiently strict to test their qualifications as practitioners."

In *Vallat* v. *Radium Dial Co.* 360 Ill. 407, we said: "In order that a statute may be held valid the duty imposed by it must be prescribed in terms definite enough to serve as a guide to those who have the duty imposed upon them. Such definiteness may be produced by words which have a technical or other special meaning well enough known to permit compliance therewith or words which have an estab-

lished meaning at common law through decisions; but if the duty is imposed by statute through the use of words which have not yet acquired definiteness or certainty and which are so general and indefinite that they furnish no such guide the statute must be declared to be invalid. When it leaves the legislature a law must be complete in all its terms, and it must be definite and certain enough to enable every person, by reading the law, to know what his rights and obligations are and how the law will operate when put into execution. (*Mayhew* v. *Nelson,* 346 Ill. 381, 387.) If the statute leaves it to a ministerial officer to define the thing to which the statute is to be applied, and if the definition is not commonly known in the modes already pointed out, the act becomes invalid, because it creates an unwarranted and void delegation of legislative power. *People* v. *Yonker,* 351 Ill. 139, 145."

The same rule was announced in *People* v. *Yonker,* 351 Ill. 139. It was there said: "It is true, as this court has frequently said, the method and manner of enforcing a law must of necessity be left to the reasonable discretion of administrative officers, but an act of the legislature which vests in such officers the discretion to determine what the law is, or to apply it to one and refuse its application to another in like circumstances, is void as an unwarranted delegation of legislative authority."

The questions as to whom the act will apply, the qualifications for a certificate, and the means employed to demonstrate those qualifications are to be found only in the opinion of the committee. No standards are fixed by the act to guide their uncontrolled discretion. The committee may apply one standard to some applicants and another standard to others. The committee may base its opinion that the applicant has satisfactorily met the requirements of the act at one time upon certain standards as to such requirements, and at other times upon different standards entirely. The opinion of the committee as to the require-

ments of the act would be subject to change with each change in the personnel of the committee.

No one can determine, from reading the act, the activities to which it is directed. The determination of those activities must await the opinion of ministerial officers to whom it is delegated by the act. No one can determine whether he comes within the act by reading the act itself. No one can determine from the act the necessary requirements to entitle him to an examination or to obtain from the committee its opinion that he has satisfactorily met all the requirements of the act. The provision that he must meet all the requirements of the act is meaningless because there are no requirements set out in the act. Until the committee acts, no one may know what those requirements are. This is clearly a delegation of legislative power to ministerial officers, in violation of section 2 of article II and section 1 of article IV of the constitution. The law cannot rest in the opinion of ministerial officers.

The act, by the definition of "professional engineering" in section 2, first includes all services requiring the application of engineering principles and data wherein the public welfare or the safeguarding of life, health or property is concerned. Then, by section 29, it attempts to exclude from that definition and from the act, among other things, "The practice of any other recognized profession or trade." For the reasons above pointed out, the language of this exclusion is likewise so indefinite that no one can determine who is excluded from the provisions of the act. For the reasons already stated, section 29 is vague, uncertain, incomplete, indefinite and incapable of enforcement, or administration.

The provisions relating to the activities which shall, and those which shall not, be included in the act are so vague and uncertain as to render the act incomplete when it left the legislature. When sections 2 and 29 are considered together, in the final analysis, the Department is given the uncontrolled and unlimited power to determine those against

484

whom it will enforce the act and those against whom it will not enforce it. The power of legislation is thus unlawfully delegated to the Department and to the committee provided for in section 3 of the act. The act cannot be sustained.

This conclusion, as to the validity of the sections of the act referred to, necessarily renders the entire act invalid. The decree of the circuit court of Sangamon county permanently enjoining the expenditure of funds for the administration of the act was clearly right, and that decree is affirmed.

*Decree affirmed.*

Mr. JUSTICE GUNN, specially concurring:

I concur in the result reached in this case but not in all that is said, especially in relation to the insufficiency of the definition of professional engineering.