2016 IL App (4th) 150522

NO. 4-15-0522

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| CHRISTOPHER JENNER, LAUREL JENNER, THOMAS KLINGNER, ADAM LIEBMANN, KELLY LIEBMANN, MICHELLE MATHIA, KRISTINA RASMUSSEN, JEFFREY TUCEK, MARK WEYERMULLER, and JUDI WILLARD, Plaintiffs-Appellants, v. THE ILLINOIS DEPARTMENT OF COMMERCE AND ECONOMIC OPPORTUNITY, Defendant-Appellee. | ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from Circuit Court of Sangamon County No. 15MR16 Honorable John Madonia, Judge Presiding. |

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices Harris and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiffs are a group of Illinois taxpayers: Christopher Jenner, Laurel Jenner, Thomas Klingner, Adam Liebmann, Kelly Liebmann, Michelle Mathia, Kristina Rasmussen, Jeffrey Tucek, Mark Weyermuller, and Judi Willard. They brought this action in Sangamon County circuit court for declaratory and injunctive relief against defendant, the Illinois Department of Commerce and Economic Opportunity, alleging that defendant had promulgated a regulation allowing tax credits greater than those allowed by statute. Defendant moved for the dismissal of the complaint on the ground that plaintiffs lacked standing (735 ILCS 5/2-619(a)(9) (West 2014)), and the trial court granted the motion, dismissing the complaint with prejudice. Plaintiffs appeal. We reverse the trial court's judgment and remand this case for further

proceedings, because taxpayers have standing to seek an injunction against the use of public funds to administer an allegedly illegal tax regulation.

¶ 2                                I. BACKGROUND

¶ 3        The Economic Development for a Growing Economy Tax Credit Act (Act) (35 ILCS 10/5-1 to 999-1 (West 2014)) authorizes defendant to award a tax credit to "[a] person that proposes a project to create new jobs in Illinois" and that "enter[s] into an Agreement with [defendant] for the Credit under this Act" (35 ILCS 10/5-15(b) (West 2014)). The "Agreement" must include, among other things, "[a] specific method for determining the number of New Employees employed during a taxable year" (35 ILCS 10/5-50(5) (West 2014)) as well as a requirement that the taxpayer "annually report to [defendant] the number of New Employees, the Incremental Income Tax withheld in connection with the New Employees, and any other information [defendant] needs to perform the Director's duties under this Act" (35 ILCS 10/5-50(6) (West 2014)).

¶ 4        The amount of tax credit under the Act "shall not exceed the Incremental Income Tax attributable to the project that is the subject of the Agreement." 35 ILCS 10/5-15(d) (West 2014). The Act defines the " 'Incremental Income Tax' " as "the total amount withheld during the taxable year from the compensation of New Employees[,] under Article 7 of the Illinois Income Tax Act [(35 ILCS 5/701 *et seq.* (West 2014)),] arising from employment at a project that is the subject of an Agreement." 35 ILCS 10/5-5 (West 2014). The Act defines " 'New Employee' " as "[a] Full-time Employee first employed by a Taxpayer in the project that is the subject of an Agreement and who is hired *after* the Taxpayer enters into the tax credit Agreement." (Emphasis added.) 35 ILCS 10/5-5(b) (West 2014).

¶ 5     The Illinois General Assembly empowered defendant to promulgate regulations implementing the Act (35 ILCS 10/5-10(a) (West 2014)), and, according to the complaint, defendant has promulgated regulations allowing tax credits greater than those the Act allows. Under defendant's regulations, it can award a tax credit no greater than "the incremental payroll attributable to the applicant's project." 14 Ill. Adm. Code 527.20 (2008) (definition of " 'Credit' "). So far, so good, but further down in section 527.20, defendant defines " 'Incremental payroll' " as " the total amount withheld by the taxpayer during the taxable year from the compensation of new employees *and retained employees* under Article 7 of the Illinois Income Tax Act [citation] arising from such employees' employment at a project that is the subject of an Agreement." (Emphasis added.) *Id.* Defendant in turn defines " 'Retained employee' " as follows: " 'Retained employee' means a full-time employee employed by a taxpayer during the term of the agreement whose job duties are directly and substantially-related to the project. For purposes of this definition, 'directly and substantially-related to the project' means at least two-thirds of the employee's job duties must be directly related to the project and the employee must devote at least two-thirds of his or her time to the project." *Id.*

¶ 6     Those regulatory definitions are, in plaintiffs' view, unlawful because they allow businesses to receive a larger tax credit than the Act permits. Instead of limiting the tax credit to the amount of the income tax withheld from *new employees'* paychecks, as section 5-15(d) of the Act requires, defendant's regulations would award businesses a tax credit up to the amount of the income tax withheld from paychecks of *both new and retained employees* who work on a project that is the subject of an "Agreement." Plaintiffs allege that these excessive tax credits, unauthorized by statute, deplete public funds and that taxpayers such as themselves could end up having to replenish the deficiency. Also, apart from their liability to replenish a deficiency in the

general revenues, plaintiffs argue that defendant's use of their tax dollars to administer illegal regulations is, in and of itself, an injury to them, the taxpayers, just as a trustee's illegal use of the trust corpus is, in itself, an injury to the beneficial owners of the corpus.

¶ 7        This two-pronged argument was unsuccessful below. The trial court regarded the State as the only real party in interest and was unconvinced that by granting tax credits pursuant to its regulations, defendant would cause any injury to plaintiffs as taxpayers. In the court's view, taxpayers had standing only when they challenged tax statutes as unconstitutional or otherwise illegal; they did not have standing when challenging how a statute "[got] interpreted" or "the judgment of policy, expenditures[,] or allocations of funds." Consequently, the court granted defendant's motion, dismissing the complaint with prejudice.

¶ 8        This appeal followed.


¶ 9                                    II. ANALYSIS

¶ 10            A. Defendant's Motion To Strike a Portion of Plaintiffs' Brief

¶ 11        Before addressing the merits of this appeal, we note that defendant urges us to strike part III of the statement of facts in plaintiffs' brief on the ground that part III contains argumentative matter. See Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013) ("Statement of Facts, which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment ***."). Part III could come across as argumentative in that it says, for example: "[Defendant's] regulations allow a business to receive a larger tax credit than [the] Act permits." But judging from the accompanying citations to the complaint, we infer that, in part III of their statement of facts, plaintiffs mean to summarize their complaint rather than to make an argument. Thus, we decline to strike part III.

¶ 12                              B. The Concept of Standing

¶ 13        The doctrine of standing saves the courts from becoming "mired in abstract questions, moot issues, or cases brought on behalf of parties who do not desire judicial aid." *In re Estate of Zivin*, 2015 IL App (1st) 150606, ¶ 14. The doctrine weeds out academic disputes brought by the "merely curious or concerned." *Id.* It does so by asking whether the plaintiff has suffered an injury to a legally cognizable interest or, if the plaintiff has not yet suffered such an injury, whether the plaintiff is in real danger of such an injury (*Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492-93 (1988)). This actual or threatened injury must be "(1) distinct and palpable [citation]; (2) fairly traceable to the defendant's actions [citation]; and (3) substantially likely to be prevented or redressed by the grant of the requested relief [citation]." (Internal quotation marks omitted.) *Id.*


¶ 14              C. The Lack of Standing as an Affirmative Defense

¶ 15        Under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2014)), the defendant "may, within the time for pleading, file a motion for dismissal of the action" on the ground that "the claim asserted against defendant is barred by \*\*\* affirmative matter avoiding the legal effect of or defeating the claim." A motion for dismissal under this section admits the legal sufficiency of the complaint but raises "a defense outside the complaint," an "affirmative matter," that defeats the action. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. Lack of standing is one such affirmative matter. *Estate of Zivin*, 2015 IL App (1st) 150606, ¶ 13.

¶ 16        When moving for the dismissal of the action on the ground of the plaintiff's lack of standing, the defendant may argue that the plaintiff's lack of standing is apparent from the

face of the complaint, or, alternatively, the defendant may file an affidavit proving the plaintiff's lack of standing. "If the grounds do not appear on the face of the pleading attacked[,] the motion shall be supported by affidavit," as section 2-619 says. 735 ILCS 5/2-619 (West 2014); see also *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994). In the present case, defendant submitted no affidavit in support of its motion for dismissal, and therefore we will decide whether it is apparent, from the face of the complaint, that plaintiffs lack standing. We will make that decision *de novo*, taking the well-pleaded facts of the complaint to be true and drawing from those facts all reasonable inferences in plaintiffs' favor. See *Chicago Teachers Union, Local 1 v. Board of Education*, 189 Ill. 2d 200, 206 (2000).

¶ 17      D. A Taxpayer's Standing To Seek an Injunction
Against an Administrative Regulation
That Effectively Would Assess an Illegal Tax

¶ 18      The supreme court has held that tax revenues, upon their collection, become public funds, of which the taxpayers are the equitable owners, and that a taxpayer has the "equitable right to restrain the illegal use or misappropriation of public funds in which he, in common with other tax-payers, ha[s] an interest." *Jones v. O'Connell*, 266 Ill. 443, 447-48 (1914). In addition to this rationale of equitable ownership, the supreme court sometimes gives another rationale for taxpayer standing: if public funds are misused, taxpayers are liable to make up the resulting deficiency. *Fergus v. Russel*, 270 Ill. 304, 314 (1915). Let us push off to one side plaintiffs' argument that statutorily unauthorized tax credits will cause a deficiency in general revenues and that they will be called upon to make up the deficiency. We can understand how that argument might be too speculative and simplistic (can one *really* predict the legislature will probably raise taxes because of the excessively generous tax credits that defendant will grant?). Let us concentrate, instead, on plaintiffs' alternative argument, the argument of equitable

ownership. Plaintiffs argue that by administering a regulation which, in violation of statute, would award a tax credit up to the amount of the income tax withheld from the paychecks of not only new employees but also retained employees, defendant has misappropriated or put to an illegal use the public funds that finance defendant's operation and that plaintiffs, as taxpayers, have an equitable right to restrain the misappropriation.

¶ 19　　　　　The plaintiffs in *Lyons v. Ryan*, 201 Ill. 2d 529, 537 (2002), made a similar argument in support of their standing, and the supreme court was unconvinced. But *Lyons* is distinguishable in that the plaintiffs in that case were seeking to impose a constructive trust on the fruits of official misconduct instead of seeking to restrain the misuse of public funds. The plaintiffs in *Lyons* were Illinois taxpayers, and they alleged that some officers and employees of the Secretary of State had conspired with a political action committee, Citizens for Ryan, to issue commercial driver's licenses to unqualified applicants in return for campaign contributions. (At the time of the lawsuit, George Ryan was the Governor of Illinois. Before holding that office, he was the Secretary of State. *Id.* at 531.) The plaintiffs sought the imposition of "a constructive trust on allegedly illegal campaign contributions, salaries of officers and employees involved in the alleged scheme, and the cost of equipment used in the alleged scheme." *Id.* at 537-38.

¶ 20　　　　　The supreme court noted, however, that the campaign contributions themselves "had no impact on the treasury." *Id.* at 538. And apparently, the scheme entailed no expenditure of public funds that, in the legitimate course of government business, would not have been spent anyway. The supreme court said: "Plaintiffs offer no basis for this court to conclude that the salaries of state employees *** would not have been paid in the absence of the alleged scheme, or that the equipment used in the alleged scheme was not used for any other legitimate purpose." *Id.*

¶ 21      The argument could be made that, unless a salary was paid that otherwise would not have been paid or unless equipment was used that otherwise would not have been used, *Lyons* forecloses the argument that the administration of a statutorily unauthorized regulation entails a misapplication of public funds, a misapplication that gives standing to a taxpayer. But the appellate court has not interpreted *Lyons* that way. In *Crusius v. Illinois Gaming Board*, 348 Ill. App. 3d 44, 47 (2004), the plaintiff, a taxpayer, sought a declaratory judgment that section 11.2(a) of the Riverboat Gambling Act (230 ILCS 10/11.2(a) (West 2000)) violated the constitutional ban on special legislation (Ill. Const. 1970, art. IV, § 13). The appellate court held that the plaintiff "had the right to enforce his interest as a taxpayer in public resources that were allegedly being used in administering an illegal legislative act." *Crusius*, 348 Ill. App. 3d at 50. *Lyons*, the appellate court said, was distinguishable for the following reason:

> "[The plaintiff in *Crusius*] did not seek a constructive trust over private donations generated through criminal activity and held by someone other than the State Treasurer, in addition to past salary and equipment expenditures. [Rather, the plaintiff] sought a declaration of unconstitutionality and to enjoin subsequent misuse of state resources in administering the allegedly unconstitutional statute." *Id.* at 51.

The appellate court cited, among other authorities, *Snow v. Dixon*, 66 Ill. 2d 443, 450 (1977), which held that "[a] taxpayer [might] bring suit to enjoin misuse of public funds in administering an illegal legislative act." *Crusius*, 348 Ill. App. 3d at 49.

¶ 22      In *Snow*, the plaintiff was an Illinois taxpayer who brought an action for an injunction pursuant to what is commonly known as the Public Moneys Act (Ill. Rev. Stat. 1975, ch. 102, ¶ 11 *et seq.*). *Snow*, 66 Ill. 2d at 450; see also *Droste v. Kerner*, 34 Ill. 2d 495, 497

(1966). (The plaintiff in *Crusius* likewise sued under the Public Moneys Act (735 ILCS 5/11-301 to 11-304 (West 2000)). *Crusius*, 348 Ill. App. 3d at 49.) The plaintiff in *Snow* complained that "State funds [were] being disbursed to effect the collection from [Illinois Central Gulf Railroad Company (Gulf Railroad)] of [an] illegal 7% Tax on charter properties." *Snow*, 66 Ill. 2d at 449.

¶ 23 What was the 7% tax on charter properties? In 1851, in the statute incorporating the Illinois Central Railroad Company (Illinois Central), the General Assembly provided that Illinois Central, in lieu of ordinary taxes, would pay a 7% gross revenue tax on its charter line, the line running from Cairo to Chicago. *Id.* at 448-49. In 1972, however, Illinois Central dissolved after selling all its assets to Gulf Railroad. *Id.* at 448. Thereafter, from 1972 to 1975, Gulf Railroad paid the 7% tax on the charter properties, in lieu of other taxes, just as Illinois Central had done—and, apparently, no official of the State of Illinois challenged Gulf Railroad. *Id.* at 449. But the plaintiff, Robert H. Snow, did so in his capacity as an Illinois taxpayer. *Id.* He argued that the statutory right to pay the 7% tax belonged exclusively to Illinois Central, not to Gulf Railroad, and he sought an injunction requiring the State of Illinois to tax Gulf Railroad the same way it taxed other railroads. *Id.*

¶ 24 The State challenged the plaintiff's standing (*id.* at 450), but the supreme court concluded he had standing and that his action for an injunction could proceed under the Public Moneys Act (*id.* at 453). Under the Public Moneys Act, a taxpayer might bring an action to restrain the misuse of public funds, and assessing the illegally low 7% tax against Gulf Railroad and collecting it amounted to a misuse of public funds: "the time of literally hundreds of State employees [was] devoted in some part to the assessment and collection of this tax." *Id.* at 450. The total dollar value of this time devoted to the assessment and collection of the 7% tax was unclear, but in any event, the amount of state funds misused was irrelevant: "[u]nder the settled

rule in this State, every taxpayer [was] injured by the misapplication of public funds, [regardless of] whether the amount [was] great or small." (Internal quotation marks omitted.) *Id.* Implementing any policy costs some amount of money, including a policy to impose an illegal tax. And long before the enactment of the Public Moneys Act, "equity ha[d] jurisdiction to enjoin the collection of an unauthorized tax"—meaning a tax that was either illegally high or, as in *Snow*, illegally low. (Internal quotation marks omitted.) *Id*. at 452.

¶ 25 Taxpayers such as Snow paid the salaries of Illinois tax officials, and when those officials implemented an illegal tax policy, their taxpayer-funded salaries were, to that extent, being put to an illegal use. See *id.* at 453. The taxpayers of the state had standing to seek an injunction against such misuses of public funds. *Id.* at 451. In fact, "a taxpayer [might] bring suit to enjoin the misuse of public funds in administering an illegal legislative act even though the taxpayer is not subject to the provisions of that act." *Id.*

¶ 26 That is because incurring an illegally high tax is not the only way a taxpayer can be injured; a taxpayer can also be injured when public funds, in which the taxpayer has a beneficial interest, are misused by implementing an invalid statute or regulation. A party has standing to challenge a statute if the party has "sustained, or [is] in immediate danger of sustaining, a direct injury as a result of enforcement of the challenged statute." (Internal quotation marks omitted.) *Pre-School Owners Ass'n of Illinois, Inc. v. Department of Children & Family Services*, 119 Ill. 2d 268, 287 (1988). The same holding applies to an administrative regulation. *Id.* "[By] asserting a misuse of public funds and resources"—regardless of whether the misuse is pursuant to an invalid statute or regulation or even, as in *Martini v. Netsch*, 272 Ill. App. 3d 693, 696 (1995), an unlawful executive order—the taxpaying plaintiff "allege[s] a distinct and palpable injury to a legally cognizable interest." *Martini*, 272 Ill. App. 3d at 696. It

- 10 -

must follow that, by asserting a threatened misuse of public funds—a threat embodied in an administrative regulation—the taxpaying plaintiff alleges a threatened distinct and palpable injury to a legally cognizable interest. Because defendant presumably will follow its own regulations on the allowance of tax credits, the threat is imminent. See *Pre-School Owners*, 119 Ill. 2d at 287.

¶ 27      We doubt that the supreme court intended to overturn these longstanding principles when, in *Lyons*, it required proof that salaries otherwise would not have been paid or that equipment otherwise would not have been used (*Lyons*, 201 Ill. 2d at 538). Surely *Crusius* is correct in regarding that requirement as applicable only to a case in which the plaintiff seeks to impose a constructive trust on bribes and similar ill-gotten gains. *Crusius*, 348 Ill. App. 3d at 51. In *Lyons*, the supreme court repeated what it had said in *Fuchs v. Bidwell*, 65 Ill. 2d 503, 509 (1976): "there was no authority conferring taxpayer standing on the basis that the funds at issue would become 'public' only upon the imposition of a constructive trust." *Lyons*, 201 Ill. 2d at 537. In the present case, by contrast, the funds will be public at the time of their misuse. Equity will restrain a governmental policy of collecting an illegal tax, because the very act of collecting it will be a misuse of taxpayer-funded salaries and offices and, as such, a misuse of public funds. *Snow*, 66 Ill. 2d at 452-53.


¶ 28               E. Defendant's Forfeiture of the Affirmative Defense That
                Plaintiffs Failed To Follow the Procedures of the Public Moneys Act

¶ 29      In a footnote of its brief, defendant says: "[P]laintiffs have never asserted reliance on the Public Monies Act [(735 ILCS 5/11-301 to 11-304 (West 2014))], and they failed to follow the procedural requirement of obtaining leave to file such a complaint, 735 ILCS 5/11-303 (2014)."

¶ 30 A couple of times in our discussion thus far, we have mentioned the Public Moneys Act. In response to defendant's footnote, we now will discuss the statute more fully. Section 11-301 of the Public Moneys Act provides: "An action to restrain and enjoin the disbursement of public funds by any officer or officers of the State government may be maintained either by the Attorney General or by any citizen and taxpayer of the State." 735 ILCS 5/11-301 (West 2014). If the plaintiff is an Illinois taxpayer, the plaintiff must petition the circuit court for permission to bring the action, and the plaintiff must give notice to the Attorney General. Section 11-303 provides:

"§ 11-303. Action by private citizen. Such action, when prosecuted by a citizen and taxpayer of the State, shall be commenced by petition for leave to file an action to restrain and enjoin the defendant or defendants from disbursing the public funds of the State. Such petition shall have attached thereto a copy of the complaint, leave to file which is petitioned for. Upon the filing of such petition, it shall be presented to the court, and the court shall enter an order stating the date of the presentation of the petition and fixing a day, which shall not be less than 5 nor more than 10 days thereafter, when such petition for leave to file the action will be heard. The court shall also order the petitioner to give notice in writing to each defendant named therein and to the Attorney General, specifying in such notice the fact of the presentation of such petition and the date and time when the same will be heard. Such notice shall be served upon the defendants and upon the Attorney General, as the case may be, at least 5 days before the hearing of such petition.

Upon such hearing, if the court is satisfied that there is reasonable ground for the filing of such action, the court may grant the petition and order the complaint to be filed and process to issue. The court may, in its discretion, grant leave to file the complaint as to certain items, parts[,] or portions of any appropriation Act sought to be enjoined and mentioned in such complaint, and may deny leave as to the rest." 735 ILCS 5/11-303 (West 2014).

¶ 31    Defendant observes that, in the proceedings below, plaintiffs (1) never asserted reliance on the Public Moneys Act and (2) never fulfilled the procedural requirements in section 11-303. As to defendant's first point, it is unclear that plaintiffs were required to specifically invoke the Public Moneys Act, considering that, instead of creating a new cause of action, the Public Moneys Act acknowledged a preexisting common-law right of taxpayers to seek an injunction against an illegal tax. See *Snow*, 66 Ill. 2d at 450-51 ("Long before the enactment of the Public Monies Act, the citizens and taxpayers of this State have been permitted to sue to enjoin the misuse of public funds."). Besides, in so many words, plaintiffs did invoke the Public Moneys Act. In their memorandum in opposition to defendant's motion for dismissal, they argued that taxpayers had "standing to challenge and enjoin the misappropriation of public funds through a public body's *administration* of an unlawful statute or regulation," and in support of that argument, they cited *Snow* and *Crusius*, in which, as we have discussed, the plaintiffs sued under the Public Moneys Act. (Emphasis in original.) In fact, plaintiffs explicitly compared themselves to the plaintiff in *Crusius*. They argued to the trial court: "Plaintiffs have standing for the same reason that the *** *Crusius* taxpayer *** had standing: because the state applies public funds in administering the regulation they challenge."

¶ 32    As for defendant's second point, that plaintiffs never fulfilled the procedures in section 11-303 of the Public Moneys Act, this would have been an affirmative defense, "a defense outside the complaint," and if only defendant had raised this affirmative defense in the proceedings below, plaintiffs could have obtained leave to amend their complaint and could have cured the defect by attaching a section 11-303 petition to their amended complaint. *Patrick Engineering*, 2012 IL 113148, ¶ 31. As it is, defendant has forfeited the affirmative defense of noncompliance with section 11-303 by failing to raise that affirmative defense in the trial court. See *Greer*, 122 Ill. 2d at 508; *Fillmore v. Walker*, 2013 IL App (4th) 120533, ¶ 28; *Fox v. Heimann*, 375 Ill. App. 3d 35, 45 (2007); *Wehde v. Regional Transportation Authority*, 284 Ill. App. 3d 297, 311 (1996); *Carlson v. City Construction Co.*, 239 Ill. App. 3d 211, 243 (1992).

¶ 33            F. The Inapplicability of Case Law Holding That Taxpayers
                Lack Standing To Sue for the Collection of Back Taxes

¶ 34    Defendant argues this case is basically an attempt to compel the collection of additional taxes and that, in *People ex rel. Morse v. Chambliss*, 399 Ill. 151 (1948), the supreme court held that taxpayers lack standing to sue for the collection of unpaid taxes. The plaintiff in that case brought an action "in the name of The People on relation of himself as a taxpayer and on behalf of all other taxpayers similarly situated, and pray[ed] for an accounting of the taxes, interest, penalties[,] and costs due upon the property of [Hugo] Chambliss." *Chambliss*, 399 Ill. at 151. The plaintiff did not sue the state; rather—in the manner of the Attorney General—he sued the property owner, Chambliss, to enforce a tax lien of approximately $13,500 against his property, a lien the plaintiff claimed had arisen as a result of taxing officials' unauthorized acceptance of $14,500 from Chambliss as full satisfaction for back taxes of $28,000. *Id.* at 152. The supreme court held: "In our opinion there is no right in an individual taxpayer to bring a suit

for the collection of taxes, but a suit having for its purpose such collection must be brought by the person or agency designated by statute for that purpose." *Id.* at 158.

¶ 35    In *Snow*, however, the supreme court distinguished *Chambliss*. The supreme court reasoned that, unlike the plaintiff in *Chambliss*, the plaintiff in *Snow* sued to restrain the *future* collection of an illegal tax. *Snow*, 66 Ill. 2d at 452. The supreme court said: "The case *sub judice* is clearly distinguishable [from *Chambliss*]. It is designed to prevent the continued acceptance of an allegedly unlawful tax in lieu of all other taxes, when the appropriate taxing authorities have declined, and still decline, to follow applicable statutory procedures requiring them to assess all of [Gulf Railroad's] property in the same manner as other railroad properties assessed." *Snow*, 66 Ill. 2d at 452. Likewise, in the present case, plaintiffs sued to prevent the continued, future acceptance of an unlawful tax or, more precisely, the implementation of an administrative regulation that contemplates the future imposition of an illegal tax: illegal because it is in an amount less than required by statute. This case is closer to *Snow* than to *Chambliss*.

¶ 36    G. The Inapplicability of the Ban on Taxpayer Derivative Actions

¶ 37    The supreme court has drawn a distinction between a " 'taxpayer action' " and a " 'taxpayer derivative action.' " *Scachitti v. UBS Financial Services*, 215 Ill. 2d 484, 494-95 (2005). A " 'taxpayer action,' " contemplated by section 11-301 of the Public Moneys Act (735 ILCS 5/11-301 (West 2014)), "is brought by private persons in their capacity as taxpayers." *Scachitti*, 215 Ill. 2d at 493. *Snow* and *Krebs v. Thompson*, 387 Ill. 471 (1944), are examples. Taxpayers bring such an action "on behalf of themselves and as representatives of a class of taxpayers similarly situated within a taxing district or area, upon a ground which is common to all members of the class, and for the purpose of seeking relief from illegal or unauthorized acts

of public bodies or public officials, which acts are injurious to their common interests as taxpayers." (Internal quotation marks omitted.) *Scachitti*, 215 Ill. 2d at 493. For more than a hundred years, the common law of Illinois has recognized the right of Illinois taxpayers to "enjoin the misuse of public funds," as we already have observed. (Internal quotation marks omitted.) *Id.* at 494.

¶ 38        By contrast, a " 'taxpayer derivative action' " is an action brought by a taxpayer on behalf of the government to enforce a right or remedy belonging to the government alone. *Id.* In a taxpayer derivative action, the only real party in interest is the government—thus the adjective "derivative"—the taxpayer brings the action derivatively, not in the taxpayer's own personal right. " 'The claimed injury [in a taxpayer derivative action] is not personal to the taxpayers, but rather impacts the government entity on whose behalf the action is brought.' " *Id.* (quoting *Lyons*, 201 Ill. 2d at 535). In both *Scachitti* and *Lyons*, the actions were taxpayer derivative actions, not taxpayer actions. *Scachitti*, 215 Ill. 2d at 496; *Lyons*, 201 Ill. 2d at 535. The plaintiffs in *Scachitti* sued a lead underwriter and an accounting firm, seeking to recover, for the State of Illinois, the amounts by which the lead underwriter had allegedly overcharged the State in connection with bond transactions. *Scachitti*, 215 Ill. 2d at 489. The plaintiffs in *Lyons* "sue[d] for the recovery of illegally obtained funds by state officials." *Lyons*, 201 Ill. 2d at 533. The plaintiffs lacked standing in these two taxpayer derivative actions because the State was the only real party in interest and the Attorney General had the exclusive constitutional authority to represent the state. *Scachitti*, 215 Ill. 2d at 500; *Lyons*, 201 Ill. 2d at 540.

¶ 39        In this appeal, defendant relies heavily on *Scachitti* and *Lyons*, but those cases are distinguishable because the present case is a taxpayer action rather than a taxpayer derivative action. Like the plaintiffs in *Snow* and *Krebs*, plaintiffs in this case sue to restrain the

misapplication of public funds. The administration of an illegal policy, regulation, or statute is the misapplication of public funds because "the time of *** State employees"—a valuable public asset paid for out of the state treasury, with taxpayers' money—"is devoted in some part to" the administration of the illegal policy, regulation, or statute. *Snow*, 66 Ill. 2d at 450; see also *Krebs*, 387 Ill. at 475. Other assets purchased by tax revenues, such as paper and electricity, also would be used. It always will cost *something* to administer a regulation, including an illegal one. The machinery of the State never runs cost-free.

¶ 40          H. The Inapplicability of Case Law Regarding Special Funds

¶ 41          Defendant cites two cases in which the plaintiffs claimed to be challenging the misuse of public funds whereas, in reality, they were challenging the alleged misuse of a special fund.

¶ 42          In one of the cases, *Barco Manufacturing Co. v. Wright*, 10 Ill. 2d 157, 159 (1956), the plaintiffs sought to enjoin some allegedly "illegal disbursements" from the Illinois unemployment compensation fund. They argued that, as taxpayers, they were "entitled to enjoin the illegal distribution of public funds." *Id.* at 160. The supreme court held, however, that instead of being general revenue raised from taxation, the Illinois unemployment compensation fund was a special fund, a trust fund consisting of contributions of employers. *Id.* at 160-61. Thus, the case law holding that taxpayers could sue to enjoin the misuse of public funds was inapplicable. *Id.* at 161. "[T]he fund in question [was] not a general public fund; nor [was] it a part of the general State revenue; and the involuntary contributions thereto [were] not general taxes." *Id.* Rather, it was "a trust fund composed of contributions made by employers." *Id.* Because "the expenditure

- 17 -

involved [was] from a trust fund," the plaintiffs had to "show a special injury not common to the public generally." *Id.* They had not done so. *Id.* at 166.

¶ 43    In the other case, *Illinois Ass'n of Realtors v. Stermer*, 2014 IL App (4th) 130079, ¶ 1, the plaintiff complained of the transfer of monies from the real estate license administration fund into the state's general revenue fund. We held that because the real estate license administration fund was a special fund, the plaintiff had no "taxpayer standing" (*id.* ¶ 30); that is, the plaintiff could not rely on the "narrow doctrine permitting a taxpayer the ability to challenge the misappropriation of public funds" (*id.* ¶ 29). As in *Barco*, the plaintiff had to "show a special injury" (*id.* ¶ 30), and the plaintiff failed to make this showing (*id.* ¶ 38).

¶ 44    *Barco* and *Stermer* are distinguishable for two reasons. First, neither case involved an unauthorized tax. "[E]quity has jurisdiction to enjoin the collection of an unauthorized tax," and when defendant grants tax credits unauthorized by statute, defendant effectively causes the imposition of an unauthorized tax. (Internal quotation marks omitted.) *Snow*, 66 Ill. 2d at 452. Second, the wages of defendant's officers and employees and the cost of defendant's office supplies and utilities are paid out of the state's general revenues, not out of a special fund (see *Krebs*, 387 Ill. at 475), and "a taxpayer may bring suit to enjoin the misuse of public funds in administering an illegal legislative act" (*Snow*, 66 Ill. 2d at 451; see also *Crusius*, 348 Ill. App. 3d at 51) or an illegal administrative regulation (*Pre-School Owners*, 119 Ill. 2d at 287).


¶ 45                    I. The Irrelevance of the Possibility of
                          a Net Economic Benefit to the State

¶ 46    Defendant cites *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125 (2011), in support of its argument that any injury to taxpayers resulting from the application

- 18 -

of its regulation would be speculative. *Winn* likewise involved a tax credit. An Arizona statute (Ariz. Rev. Stat. Ann. § 43-1089 (West Supp. 2010)) allowed Arizona taxpayers a dollar-for-dollar tax credit for their contributions to school tuition organizations. *Winn*, 563 U.S. at 130. These school tuition organizations used the contributions to provide scholarships to students attending private schools, many of which were religious. *Id.* at 129. Because the beneficiaries of the contributions included religious schools, a group of Arizona taxpayers "challenge[d] the *** tax credit as a violation of Establishment Clause principles under the First and Fourteenth Amendments" (U.S. Const., amends. I, XIV). *Winn,* 563 U.S. at 129. The Supreme Court of the United States concluded that the taxpayers lacked standing under article III of the federal constitution. *Id.* at 130. In reliance on the Supreme Court's reasoning in *Winn*, defendant argues the record is devoid of any showing that its tax-credit regulation will inflict a distinct and palpable injury on plaintiffs as taxpayers.

¶ 47        The Supreme Court reasoned in *Winn*: "When a government expends resources or declines to impose a tax, its budget does not necessarily suffer. On the contrary, the purpose of many governmental expenditures and tax benefits is to spur economic activity, which in turn *increases* government revenues." (Emphasis in original and internal quotation marks omitted.) *Winn*, 563 U.S. at 136. And besides, the Supreme Court reasoned, "even if one assume[d] that an expenditure or tax benefit deplete[d] the government's coffers," one could only speculate whether "elected officials [would] increase a taxpayer-plaintiff's tax bill to make up the deficit." (Internal quotation marks omitted.) *Id.*

¶ 48        By this reasoning, though, the plaintiff in *Snow* would have lacked standing, and the judgment should have been for the State. After all, Gulf Railroad was being given a tax break—just like the contributors to school tuition organizations in *Winn*—and the plaintiff sued

to stop the tax break as contrary to Illinois law. *Snow*, 66 Ill. 2d at 449. A "tax credit" is nothing but a euphemism for a tax break. Year after year, from 1972 through 1975, the state had been giving Gulf Railroad a break on its taxes, allowing it to pay only a 7% tax on charter properties, whereas, under statute, only Illinois Central was entitled to that low rate. *Id.* at 448-49. Obviously, by providing in the first place that Illinois Central would have to pay only a 7% gross revenue tax, the Illinois General Assembly intended to stimulate economic activity and thereby increase public revenues. It would have been easy, in the manner of *Winn*, to carry over that justification to Gulf Railroad. There would have been the same potential for greater economic activity and increased public revenues if Gulf Railroad likewise had paid only a 7% tax, as Illinois Central had been doing for the past hundred years. Thus, by the logic of *Winn*, the injury to taxpayers would have been merely speculative, and they would have lacked standing. But the Supreme Court of Illinois did not see it that way. *Id.* at 453. Illinois courts "are not *** required to follow the Federal law on issues of justiciability and standing." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 491 (1988). "[T]o the extent that the State law of standing varies from Federal law, it tends to vary in the direction of greater liberality ***." *Id.*

¶ 49     When it comes to taxpayer standing, Illinois courts are more generous in two ways. First, although the Supreme Court of the United States "has rejected the general proposition that an individual who has paid taxes has a continuing, legally cognizable interest in ensuring that those funds are not *used* by the Government in a way that violates the Constitution" (emphasis in original and internal quotation marks omitted) (*Winn*, 563 U.S. at 134), the rule in Illinois is precisely the opposite: "a taxpayer may bring suit to enjoin the misuse of public funds in administering an illegal legislative act even though the taxpayer is not subject to the provisions of that act" (*Snow*, 66 Ill. 2d at 451). Second, although the Supreme Court of the

United States denies standing to taxpayers because "[t]he effect upon future taxation, of any payment out of funds, [is] too remote, fluctuating[,] and uncertain to give rise to a case or controversy" (internal quotation marks omitted) (*Winn*, 563 U.S. at 134), Illinois courts find an injury to taxpayers the moment public funds are used illegally, regardless of the ultimate effect of such illegal use on the treasury or on rates of taxation (see *Krebs*, 387 Ill. at 475-76).

¶ 50        To be sure, when holding that taxpayers have standing to enjoin the misapplication of public funds, some Illinois cases have relied on the taxpayers' "liability to replenish the public treasury for the deficiency which would be caused by misapplication thereof." *Beardsworth v. Whiteside & Rock Island Special Drainage District*, 356 Ill. 158, 169 (1934); *Washburn v. Forest Preserve District of Cook County*, 313 Ill. 130, 132 (1924); *Malec v. City of Belleville*, 384 Ill. App. 3d 465, 468-69 (2008). But such liability is not the *sine qua non* of taxpayer standing. In *Krebs*, the supreme court held it did not matter that the administration of an illegal statute would result in a net profit to the state (and, hence, no deficiency for taxpayers to replenish). *Krebs*, 387 Ill. at 475.

¶ 51        The taxpayer in *Krebs* sought to enjoin state officials from expending any public funds for the administration of an act entitled " 'An Act to regulate the practice of professional engineering.' " *Id.* at 472 (challenging Ill. Rev. Stat. 1943, ch. 48½). He contended the statute was unconstitutionally vague. *Id.* at 476. The state officials argued the plaintiff lacked standing to make this constitutional challenge because, "from a financial standpoint, [the act would be] self-sustaining": "the fees paid in by registrants under the act [would] exceed the cost of administering the act." *Id.* at 473. The cost of administering the act would not exceed $11,000, and when the approximately 5000 registrants paid a fee of $20 apiece, the state would be well in the black. *Id.* The supreme court responded:

"The showing of appellants by the affidavits attached to their motion to dismiss is that there will be an estimated administration expense of $11,000. This can be paid only out of the general funds of the State. The expenditure of this or any other amount from the general funds of the State for the purpose of administering an unconstitutional statute is such an injury to every taxpayer that he may bring a suit to enjoin such unlawful expenditure and misapplication of the funds of the State. The fact that an equal or greater amount than the amount expended for the administration of the act will be ultimately produced from fees paid under the act, and paid into the State Treasury, has nothing whatever to do with the right of a taxpayer to enjoin the misapplication of public funds for the administration of the act, if it is not a valid statute. Under the settled rule in this State, every taxpayer is injured by the misapplication of public funds, whether the amount be great or small. Such injury is not prevented by the fact that the State may thereafter receive fees under an unconstitutional statute in excess of the cost of its administration." *Id.* at 475-76.

¶ 52        Thus, unless the administration of an illegal regulation is cost-free (and it is difficult to see how it ever would be), the taxpayer has standing to seek an injunction, regardless of whether the regulation would bring a net profit to the state and regardless of whether the cost of administration is small. See *id.* That is because, as we noted earlier, the supreme court relies on an equitable-ownership rationale, not just the rationale that taxpayers are liable to replenish deficiencies in the general revenues.

¶ 53                                    III. CONCLUSION

¶ 54          In sum, a taxpayer has standing to enjoin the administration of a regulation that, in its terms, exceeds the agency's legal authority. This opinion should not be interpreted more freely. We do not mean to confer standing to challenge a regulation that, in the view of the taxpayer-plaintiff, is unwise, inefficient, improvident, or not the best means of accomplishing a statutory objective. Rather, the regulation has to be illegal, or in conflict with statutory or constitutional law, in which case a taxpayer has standing to seek an injunction against the use of public funds to administer the illegal regulation. Because plaintiffs allege that defendant's regulation allows a tax credit unauthorized by statutory law, we hold that they have standing, and we reverse the trial court's judgment and remand this case for further proceedings.

¶ 55          Reversed and remanded.